UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| ODELL GRIFFIN, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 10-49-GFVT |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| HARLEY G. LAPPIN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

***** ***** ***** *****

The Court considers the following pleadings: (1) the Motion to Dismiss or, in the Alternative, Motion for Summary Judgment ("Motion to Dismiss") [R. 28] filed by the United States; (2) *pro se* Plaintiff Odell Griffin's Response [R. 35] to that motion; (3) Griffin's motion to amend [R. 26]; and (4) Griffin's motions for reconsideration [R. 34 and 36] of an earlier Order [R. 3] denying him the appointment of counsel. For the reasons that follow, the Court will grant the United States' Motion to Dismiss. Accordingly, the Court will deny Griffin's motions to amend and for appointment of counsel.

**I.**

Griffin filed this action on December 8, 2009, in the United States District Court for the District of Columbia ("the District of Columbia"). He asserted numerous Eighth Amendment medical claims under 28 U.S.C. § 1331, pursuant to the doctrine set forth in *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971). Griffin demanded $1,000,000.00 in compensatory damages from the named defendants: Bureau of Prisons ("BOP") Director Harley

1

Lappin; Eric Wilson, Warden, USP-McCreary; and Health Services Administrator Lisa Gregory. He also sought preliminary injunctive relief directing USP-McCreary officials to provide him with unspecified medical care. On January 20, 2010, the District of Columbia transferred Griffin's *Bivens* Complaint to this Court based upon venue considerations.[1] [R. 6.]

Although Griffin originally asserted only Eighth Amendment *Bivens* claims, one month before filing his Complaint he submitted an FTCA administrative claim in accordance with 28 U.S.C. § 2675 [R. 16-1, pp. 3-8]. By letter dated November 4, 2009, Michelle T. Fuseymore, BOP Regional Counsel, acknowledged that claim and advised Griffin that the BOP had six months to review, consider, and adjudicate his claim. [*Id.*, p. 2; R. 28-4.] The BOP subsequently denied Griffin's FTCA negligence claim on February 12, 2010. [*See* Letter, R. 28-1, p. 1; R. 28-5.] Fuseymore stated that according to Griffin's medical records, he had received the appropriate medical treatment for his condition and that no evidence of medical negligence or permanent disability existed. [*Id.*] Fuseymore further advised Griffin that if he disagreed with the determination, he had six (6) months from the date of the denial letter to file suit in federal court. [*Id.*]

On March 4, 2010, three weeks after the BOP denied his FTCA claim, Griffin filed a motion to amend his Complaint to assert additional Eighth Amendment medical claims. He further asked to name additional defendants, and he sought permission to assert negligence claims under the FTCA. [R. 12.] On March 18, 2010, after screening the Complaint, the Court dismissed Griffin's *Bivens* Eighth Amendment claims on the merits, dismissed his FTCA

---

[1] As the Clerk of this Court did not receive the proper "transfer out" documentation from the District of Columbia until February 16, 2010, it could not open this action until that date. [R. 7.]

without prejudice for failure to exhaust under 28 U.S.C. §2675(a), and denied his motions seeking the appointment of counsel, discovery, and a preliminary injunction. [R. 13 and 14.]

On April 5, 2010, Griffin filed a Motion to Alter or Amend Judgment, seeking reconsideration of the dismissal of his *Bivens* and FTCA claims. [R. 16.] Griffin attached to his motion the November 4, 2009 letter from the BOP's Regional Counsel, acknowledging the submission of his FTCA administrative claim.[2] Based upon the BOP's acknowledgment letter, the Court set aside the part of its prior Order dismissing the FTCA claims, partially granted Griffin's motion to amend, and ordered the United States to be named as the defendant and respond to the FTCA claims. [R. 20.] The *Bivens* allegations remain dismissed.

**II.**

Griffin states that between September 2, 2004, and June 27, 2007, while he was confined in a District of Columbia Jail, he was seen by three medical specialists: a urologist, a nephrologist, and a renal specialist. Griffin alleges that these specialists determined that he suffered from kidney stones which caused a serious blockage in his urinary tract and required removal. [*See* Complaint, R. 1, ¶ 5.] It is undisputed that after falling from a stool at USP-McCreary on August 24, 2009, Griffin sustained a broken leg, that the fracture healed slowly, and that the removal of the cast was delayed for many weeks until his bone had properly healed.

In his various filings, *i.e.*, his Complaint [R. 1], Motion to Amend [R. 12], and Response to the Motion to Dismiss [R. 35], Griffin has advanced a general time-line setting forth what

---

[2] Although the BOP's acknowledgment letter as to Claim # TRT-MXR-2010-00583 is dated November 4, 2009, Griffin did not submit it when he moved to amend his Complaint on March 4, 2010.

medical treatment he received from the BOP between June 27, 2007, the date on which he came into BOP custody, and January 2010. As part of its Motion to Dismiss, the United States attached the Declaration of Dr. Richard Ramirez, BOP Regional Director,[3] who also provided a detailed twenty-page chronological outline of Griffin's medical treatment between June 27, 2007, and May 5, 2010. [R. 28-6.]

Dr. Ramirez's time-line is substantially consistent with Griffin's time-line of the medical treatment he received during that time period. Accordingly, reiterating line by line Dr. Ramirez's detailed summary of Griffin's medical treatment is unnecessary. To fully address the claims raised in the Motion to Dismiss, the Court summarizes Griffin's medical treatment between June 2007 and May 2010 as follows:

<u>August 1, 2007- August 20, 2009</u>

When Griffin arrived at USP-Big Sandy on August 1, 2007, medical staff performed a Medical Intake Screening and a Health Intake Assessment, finding that Griffin suffered from kidney stones. Between August 8, 2007, and November 6, 2007, USP-Big Sandy medical staff examined and evaluated Griffin, collected urine samples, ran laboratory tests, and concluded that he suffered from kidney problems related to kidney stones.

On May 27, 2008, Griffin was transferred to USP-McCreary. [*See* Ramirez Decl., R. 28-6, pp. 4-5.] Between May 29, 2008, and August 14, 2009, the USP-McCreary medical staff rendered numerous medical services to Griffin, including, but not limited to: performing a Medical Intake Screening and Health Intake Assessment; diagnosing him as suffering from

---

[3] Dr. Ramirez is currently the Acting Clinical Director at USP-Big Sandy and was previously the Acting Clinical Director at USP-McCreary. [*Id.*, p. 1.]

chronic renal failure, kidney stones, iron deficiency/anemia, and obesity; requesting a consultation with the Clinical Director because of Chronic Renal failure; obtaining approval for Griffin to be examined by Dr. Eric Ruby, a urologist; treating him for chills and fever; monitoring his kidney disease; adjusting his medications; obtaining urine cultures and performing several urinalysis tests in response to his complaints;[4] performing CT scans and numerous lab tests; arranging for him to undergo a colonoscopy on November 5, 2008 (during which two polyps were removed); examining him numerous times during numerous chronic care visits; and having the urologist assess his condition and prescribe the appropriate treatment when Griffin complained on August 14 and 20, 2009, of pain and complications when urinating. [*See* Ramirez Decl., *Id*., pp. 5-11.]

August 24, 2009- May 5, 2010

On August 24, 2009, Griffin was brought to Health Services complaining of pain in his abdomen, but he was passing urine and stool. Health Services examined him and notified him that a urologist consultation was pending, but told him that if urine output slowed or stopped, he should alert a staff member immediately. On that date, Health Services personnel responded to an emergency in housing Unit 2B and, upon arrival, found Griffin on the floor. Griffin stated that his "leg just gave away" and he fell while standing. After reviewing the video, Health Services personnel confirmed that Griffin's right leg suddenly gave away and he fell to the floor.

---

[4] Between September 2, 2008, and September 4, 2008, Griffin was found to have stable kidney function. On October 27, 2008, staff again determined that his kidney function was stable. Further, while the April 15, 2009 laboratory results showed that Griffin had Stage IV Chronic Kidney Disease, the July 24, 2009, laboratory results showed that he had Stage III Chronic Kidney Disease.

Griffin was transported to the Health Services Unit. There, he was evaluated, his leg was x-rayed, and he was diagnosed with a fracture to the right fibula and a possible fracture to the distal tip of the right tibia. An orthopedic doctor was consulted, who suspected that Griffin suffered from: (1) renal osteodystrophy, a bone disease common in people with kidney disease, which occurs when the kidneys fail to maintain the proper level of calcium and phosphorus in the blood, and (2) a pathology fracture, which occurs when a bone breaks in an area weakened by another disease process. Griffin was transferred to a hospital, but returned from the hospital on the same date with a soft cast on his leg.

On August 25, 2009, Health Services performed a follow-up examination. They removed the splint and applied a long-leg cast. When Griffin complained of abdominal pain and a lack of bowel movements, medical staff performed another general urinalysis and ran more lab tests. Based on the urinalysis results, the urologist ordered an ambulance to transport Griffin to the Scott County Hospital Emergency room for further evaluation.

On August 26, 2009, Health Services contacted the Hospital to follow-up on Griffin's condition. Health Services was informed that Griffin had undergone: (1) a cystoscopy, a procedure used to see the inside of the bladder and urethra; (2) placement of a dialysis catheter; and (3) a bilateral stenting, a procedure in which a stent, a small, soft, hollow tube, is placed in the ureter to improve urinary drainage from the kidneys. Griffin was scheduled to undergo dialysis treatment and remained in the ICU in critical condition.

On August 27, 2009, Health Services inquired about Griffin's condition. They were informed that Griffin remained in the ICU and would be undergoing dialysis, that he had improved overall, and that he was scheduled to see an orthopedic surgeon and undergo a renal

biopsy. Health Services again followed up on August 28, 2009, learning that Griffin could resume normal activity on Monday, August 31, 2009, that he had been transferred from the ICU to a regular room, and that he would not need long term dialysis. On August 31, 2009, the orthopedic surgeon contacted Health Services, stating that the dialysis catheter had been discontinued and that Griffin's leg cast should be removed in four weeks after taking more x-rays. Griffin returned to USP-McCreary on that date and underwent an evaluation at Health Services, where he had no complaints and denied pain.

During September of 2009, Health Services examined Griffin numerous times, extensively monitored both his renal and orthopedic conditions, ran more laboratory tests, prescribed medications for Griffin's urinary tract condition, and told Griffin to take his antibiotics and increase his fluid intake. Griffin was assessed with acute renal failure caused by kidney stones obstructing the path to his ureter. On October 8, 2009, Dr. Christopher Harris of the Knoxville Urology Clinic[5] prepared a letter assessing Griffin's condition, which he described as acute renal failure and chronic renal insufficiency. Based on Griffin's x-ray results revealing kidney stones on the left and right side of his kidney, Dr. Harris concluded that Griffin is a "known stone former" who would require further intervention to eradicate the stones. Dr. Harris recommended pursuing specific medical procedures to disintegrate Griffin's kidney stones.

Because x-ray results showed satisfactory healing, Health Services removed Griffin's cast on October 16, 2009. Two weeks later, Griffin complained of pain in that leg. Health Services ordered x-rays, which showed that the bone had not healed, and placed Griffin's leg in a

---

[5] Dr. Harris placed the bilateral stents when Griffin was taken to the hospital in August of 2009.

long cast.  During November of 2009, Health Services requested more urologist consultations to address the removal of kidney stones from Griffin's left kidney and draining urine.

In December of 2009, medical staff monitored Griffin's broken leg and requested an orthopedic consultation.  On December 21, 2009, a radiologist reviewed the x-rays and medical staff requested an orthopedic consultation to address delays in healing.  On December 23, 2009, the medical staff removed the old cast, placed a new one on Griffin's leg, and modified it the next day because Griffin complained it was too tight.  On December 31, 2009, Health Services again examined Griffin and determined that his kidney condition had improved.  On January 6, 2010, a urologist drained urine directly from the upper part of Griffin's urinary system and inserted a tube in his back.  USP-McCreary medical staff changed Griffin's dressing the next day and removed the tube on January 13, 2010.

On February 4, 2010, Griffin reported to Health Services complaining of blood in his urine, and Health Services ordered a urinalysis.  On February 8, 2010, Health Services reviewed Griffin's December 8, 2009 laboratory results, finding that his Chronic Kidney Disease was the same with no improvement.  On February 16, 2010, Health Services examined Griffin's leg fracture, found mild healing, and recommended that he remain in the cast for two more weeks.  On February 26, 2010, Health Services prepared Griffin for another colonoscopy.

On March 16, 2010, Health Services made an appointment to remove the left side stent and place the right side stent.  On the same day, Health Services modified Griffin's cast to address his complaints of trouble with it.  On March 18, 2010, medical staff removed the cast, ordered x-rays, and noted that Griffin needed to begin bearing weight.

On April 5, 2010, Health Services reviewed x-rays results, found a visible fracture line

and no significant change in healing, and scheduled an orthopedic consultation. Griffin then underwent a procedure at an outside Urology Clinic to break up his kidney stones and place new stents. On April 7, 2010, Health Services examined Griffin, followed up with the urologist, and scheduled an appointment for six weeks later. On April 16, 2010, Health Services ran new laboratory tests on Griffin. On April 30, 2010, Health Services examined Griffin and ordered new laboratory tests, noting that he did not complain of pain when urinating and that the orthopedic doctor had recently determined that his leg fracture had healed. On May 5, 2010, medical staff x-rayed Griffin's abdomen and the results showed a calculus just beneath the stent which had been placed on the left side of Griffin's kidney. [*See* Ramirez Decl., *Id*., pp. 11-18].

**III.**

The issue of contention in this proceeding is whether the medical treatment which the medical staff at USP-Big Sandy and USP-McCreary gave Griffin deviated from the applicable standard of care under Kentucky law, and, if so, whether the alleged deviation and resulting negligence either caused Griffin's conditions or proximately caused any pre-existing conditions to worsen. Griffin alleges that the defendants' failure to provide him with proper medical care between June of 2007 and August of 2009 caused him to experience significant renal and urinary deterioration on August 24, 2009, and further caused him to fall on that date, fracture his leg, and suffer complications resulting from that fall. The United States disagrees and contends that Griffin received prompt and comprehensive medical care during that three-year time period.

The United States has moved to dismiss Griffin's FTCA claims on two grounds: (1) that he filed his claims after the applicable Statute of Limitations had expired; and (2) that based on Dr. Ramirez's uncontradicted Declaration, the medical care provided at USP-Big Sandy and

9

USP-McCreary was consistent with the standard of care of a reasonable medical practitioner under Kentucky law.

Dr. Ramirez concluded that Griffin's medical complications between 2007 and 2010, and the need for emergency treatment, was due to the inherent nature of his twenty-year chronic kidney condition, not because of medical negligence. [R. 28-6, p. 20, ¶¶ 23-25.] Dr. Ramirez opined that Griffin's leg fracture failed to promptly heal due to "the pathological nature of the fracture, not a deviation of the standard of care." [*Id.*, ¶ 25.]

As for the broken leg Griffin sustained after falling on August 24, 2009, the United Sates contends that the injury and resulting complications are attributable not to negligent medical treatment between 2007 and 2009, but to a bone disease from which Griffin suffered known as "renal osteodystrophy," a common side effect of kidney disease. The United States further argues that USP-McCreary medical staff immediately responded to Griffin's fall on August 24, 2009, promptly transported Griffin to a hospital for emergency treatment, and properly treated Griffin's chronic kidney condition and orthopedic problems when he returned to USP-McCreary.

The United States argues that Griffin's speculative and unsupported conclusions of negligence and proximate cause do not satisfy the elements of Kentucky negligence law. The government contends that because Griffin has presented no expert opinion establishing that BOP medical officials deviated from the standard of care with respect to any of his medical treatment, he has not established medical malpractice under Kentucky law and the FTCA. Finally, the United Stated alleges that due to the complexities of Griffin's various renal, urinary, and related medical conditions, he cannot rely on the "common knowledge" exception, under which an expert is not needed where the common knowledge or experience of laymen is extensive enough

10

to infer negligence from the facts.

Griffin alleges that he timely asserted his FTCA claims, but that if he missed the applicable statute of limitation, the Court should equitably toll the statute of limitations due to his medical disabilities. Griffin argues that he has established a *prima facie* case of medical negligence dating back to his confinement in USP-Big Sandy and that the BOP breached its duty of care to him under both Kentucky law and 42 U.S.C. § 4042. Griffin further argues that under the "common knowledge" exception, he is not required to present an expert opinion supporting his claim that the BOP medical staff was medically negligent. Finally, he asks to be appointed counsel to assist him.

Federal Rule of Civil Procedure 12(b)(6) permits a party to assert certain defenses, such as improper venue or lack of personal jurisdiction, by motion. Grounds for dismissal under Rule 12(b), such as failure to exhaust administrative remedies and the statute of limitations, are commonly decided on motions to dismiss, a practice which the Sixth Circuit and the Supreme Court have approved. *Scott v. Ambani*, 577 F.3d 642, 647 (6th Cir. 2009); *Jones v. Bock*, 549 U.S. 199, 215 (2007). Because the United States has included additional material in support of its motion and has relied upon materials extrinsic to the Complaint, the Court will treat the Motion to Dismiss as one for summary judgment under Federal rule of Civil Procedure Rule 56. *See* Fed. R. Civ. P. 12(d); *Mays v. Buckeye Rural Elec. Co-op, Inc.*, 277 F.3d 873, 877 (6th Cir. 2002); *Ball v. Union Carbide Corp.*, 385 F.3d 713, 719 (6th Cir. 2004).

## IV.

The Defendants argue that because Griffin failed to timely exhaust his FTCA claims prior to filing this action on December 8, 2009, his claims are time-barred, and the Court lacks subject

11

matter jurisdiction to consider them. Under the specific facts of this case, Griffin's FTCA claims are not time-barred and this Court has jurisdiction over them. The Defendants, however, are entitled to summary judgment because no genuine issue of material fact exists.

### A.

When Griffin filed this action on December 8, 2009, he asserted only Eighth Amendment claims under *Bivens*. He had submitted his FTCA administrative claim one month prior, but he had not received the BOP's official decision with respect to the claim. The BOP did not deny Griffin's FTCA claim until February 12, 2010. Griffin sought permission on March 4, 2010, to amend his pending Bivens Complaint to assert additional medical negligence claims under the FTCA.

A district court has subject matter jurisdiction over an FTCA claim only if the claimant has presented a claim to the appropriate federal agency within two years of its accrual and has commenced an action within six months after the agency mails the notice of final denial of the claim. 28 U.S.C. § 2675(a); *Garrett v. United States*, 640 F.2d 24, 25 (6th Cir. 1981). The FTCA's strict statute of limitations bars suit unless these two steps are taken. 28 U.S.C. § 2401(b); *Blakely v. United States*, 276 F.3d 853, 865 (6th Cir. 2002).

In this case, however, the BOP's February 12, 2010 denial letter advised Griffin that he must file a civil action asserting his FTCA claims within six months of the date of the letter. [*See* BOP Letter, R. 28-2; *see also* 28 U.S.C. § 2401(b).] Griffin's six-month period expired on August 12, 2010. Griffin asserted his FCTA negligence claims on March 4, 2010, three weeks after the BOP denied his FTCA claims. Specifically, on that date, Griffin filed his motion to amend, asked to name the United States as a defendant, and tendered an Amended Complaint

12

asserting FTCA claims.[6]  By March 4, 2010, Griffin had completed the FTCA administrative remedy procedure set forth in § 2675.

On May 4, 2010, the Court granted Griffin's motion to amend to name the United States as the defendant and reopened this action as to the FTCA claims. [R. 20.]  The United States was served with Griffin's Amended Complaint on May 10, 2010. [R. 22.]  The United States filed the instant Motion to Dismiss on July 12, 2010, before the six-month FTCA statute of limitations expired on August 12, 2010.  If Griffin had not filed suit on December 8, 2009, asserting only *Bivens* claims, but had initiated this action on March 4, 2010, asserting only FTCA negligence claims, those FTCA claims would have been timely asserted.

This Court has reached the same result under almost identical facts.  *See Staples v. Dewalt*, 2009 WL 1505560 (E.D. Ky. May 27, 2009).  Staples filed suit in November 2007, asserting only *Bivens* Eighth Amendment claims.  *Id.* at *1.  On April 15, 2008, the BOP denied his FTCA administrative claim, and on August 15, 2008, Staples filed a motion to amend his Complaint to assert FTCA claims.  *Id*. at *4.  Judge Jennifer B. Coffman concluded that because Staples filed his motion to amend within the requisite six-month period, he had timely asserted his FTCA claims in the action.  *Id*. at *5.  Because the United States was served with the Amended Complaint prior to the expiration of the six-month FTCA statute of limitations period, Griffin timely asserted his FTCA claims in this proceeding.

**B.**

The FTCA waives the sovereign immunity of the United States government and confers

---

[6] Under Federal Rule of Civil Procedure 15(a), a party can amend a pleading once without leave of Court if no responsive pleading has been filed.

subject matter jurisdiction on the federal district courts to hear tort actions against the federal government arising from the negligence of its employees. In relevant part, the FTCA authorizes suits against the government to recover damages:

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).

Congress restricted the FTCA to circumstances in which "a private individual [would be liable] under like circumstances." 28 U.S.C. § 2674. It provides the exclusive remedy for tort actions against the federal government, its agencies and employees. *Ascot Dinner Theatre v. Small Business Admin.*, 887 F.2d 1024, 1028 (10th Cir. 1989). Federal prisoners are included as possible plaintiffs in FTCA cases. *United States v. Muniz*, 374 U.S. 150 (1963). *See also* 28 U.S.C. § 1346(b)(1); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 700 (2004).

As a general rule, domestic liability on the part of the federal government under the Federal Tort Claims Act is determined in accordance with the law of the state where the event giving rise to liability occurred. 28 U.S.C. §§ 1346(b), 2674; *Federal Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 478 (1994); *Young v. United States*, 71 F.3d 1238, 1242 (6th Cir. 1995). This extends to claims of medical negligence. *Vance v. United States*, 90 F.3d 1145, 1148 (6th Cir. 1996); *Sellers v. United States*, 870 F.2d 1098, 1101 (6th Cir. 1989).

In this case, the Court must examine Kentucky law. In Kentucky, a *prima facie* case of medical negligence must include proof of the following elements: (1) a duty of care; (2) breach of that duty; (3) actual injury, and (4) that the injury was proximately caused by the negligence.

*Mullins v. Commonwealth Life Ins. Co.*, 839 S.W.2d 245 (Ky. 1997); *Ferguson v. United States Army*, 938 F.2d 55 (6th Cir. 1991); *Deutsch v. Shein*, 597 S.W.2d 141, 143 (Ky. 1980). Expert testimony is generally required to show that a medical care provider failed to conform to the applicable standard of care. *See Vance by and through Hammons v. United States*, 90 F.3d 1145, 1148 (6th Cir. 1996); *Perkins v. Hausladen*, 828 S.W.2d 652, 655-56 (Ky. 1992); *Jarboe v. Harking*, 397 S.W.2d 775, 777-78 (Ky. 1965). An expert's opinion must be based "on reasonable medical probability and not speculation or possibility." *Sakler v. Anesthesiology Associates, P.S.C.*, 50 S.W.3d 210, 213 (Ky. App. 2001).

Griffin has provided neither medical expert opinions nor statements of other physicians, identifying the duty of care of a reasonably competent practitioner in the same medical field as to *any* of his medical conditions. Further, he has provided no evidence that any federal employee breached that undefined duty of care and no evidence that any federal employee caused his pre-existing kidney and related urinary conditions to worsen. Griffin refers to his medical records, but they cannot speak for themselves. Griffin cannot avoid producing an expert opinion of negligence by offering only his own conclusory opinions regarding his medical treatment. He is required to present a direct expert opinion supporting his claim of medical malpractice. *Alexander v. Crawford Radiology Clinic*, 2008 WL 540906, at *2 (Ky. Ct. App. Feb. 29, 2008); *Reams v. Stutler*, 642 S.W.2d 586, 588 (Ky. 1982); *Blair v. Eblen*, 461 S.W.2d 370, 373 (Ky. 1970).

Griffin correctly notes that Kentucky law recognizes the "common knowledge exception" under which an expert is not needed to establish negligence where the "common knowledge" or experience of laymen is extensive enough to recognize or to infer negligence from the facts.

*Perkins*, 828 S.W.2d at 655. But where a plaintiff alleges negligence based on complex conditions and prolonged medical treatment, a layman cannot recognize or infer negligence, and the plaintiff must offer an expert medical opinion establishing a breach of the standard of care or an aggravation of his condition. *See Jarboe*, 397 S.W. 2d at 778.

Griffin suffered from chronic, although often acute, renal/urinary conditions between 2007 and 2010 which required consultations with specialists, hospitalization, constant monitoring, numerous medications, extensive and complex treatment, including but not limited to dialysis, colonoscopies, x-rays, CT scans, frequent urinalysis tests, "nephrostomy" (placing stents to drain urine from the urinary system), and "percutaneous nephroscopy with a lithotripsy" (using high energy shock waves to disintegrate kidney stones). Under these facts, the proper diagnosis and treatment for Griffin's serious chronic urological and kidney conditions would not be, and could not be, common knowledge. *Lyons v. United States*, 2009 WL 997300, at *5 (N. D. Ohio Apr. 14, 2009) (holding that a prisoner alleging that defendants breached the standard of care and aggravated his congenital urological condition could not use the "common knowledge exception" to establish negligence). Accordingly, the "common knowledge exception" does not apply, and Griffin was required to present medical expert evidence to prove that the BOP medical providers either caused his conditions or caused them to worsen. *See Rigney v. Marcum*, 2007 WL 2979931, at *11 (E.D. Ky. Oct. 11, 2007) (holding that a lay analysis would not suffice in the context of sophisticated medical assessment).

Dr. Ramirez explained that Griffin's medical complications between 2007 and 2010 and the need for emergency treatment stemmed from the nature of his twenty-year chronic kidney condition, not because of medical negligence on or before August 24, 2009. [R. 28-6, p. 20, ¶¶

16

23-25.] As Dr. Harris noted in his report of October 8, 2009, Griffin is a "known stone former" who will require surgical procedures to remove the kidney stones. [*Id*., p. 12.] Griffin's propensity to form kidney stones was not the fault of any of the BOP medical providers.

Further, Dr. Ramirez noted that the orthopedic doctor who treated Griffin on August 24, 2009, suspected that Griffin's renal and urinary conditions caused him to suffer from a secondary condition, renal osteodystrophy, that causes weakening of his bones. [*Id*., p. 12.] Absent any medical proof from Griffin to the contrary, his weakened bones likely caused him to fall and break his leg. Finally, Dr. Ramirez concluded that the delay in healing of Griffin's leg fracture was attributable not to the BOP's treatment or any deviation from the standard of care, but to the pathological nature of the fracture itself. [*Id*., ¶ 25.]

Griffin provides no medical proof substantiating his claim that the BOP medical staff at either prison negligently treated him or failed to provide him with proper outside treatment for his complex kidney/urinary conditions on or before August 24, 2009, or that they negligently treated his broken leg after August 24, 2009. He offers only his own speculative opinion, unsupported by any qualified medical expert, to refute Dr. Ramirez's opinions as to the causation of his medical complications between 2007 and 2010. Merely speculating about the standard of care and causation is inadequate when an expert opinion on the matters is required. *See Horn by Parks v. Madison City, Fiscal Ct*., 22 F.3d 653, 659 (6th Cir. 1994).

Further, the voluminous medical records [R. 30 (Sealed)] and Dr. Ramirez's Declaration establish that the medical providers at both USP-Big Sandy and USP-McCreary provided Griffin with prompt and proper medical attention between 2007 and 2010. Griffin was monitored and evaluated on almost a daily basis during this time period. He was treated by specialists on

numerous occasions, and he was taken to the hospital on August 24, 2009, as soon as USP-McCreary medical staff determined that a medical emergency had arisen.

The BOP medical professionals responded to each of Griffin's medical issues by providing him with as much, if not more, medical treatment than many people who are not confined receive. The Court accepts Dr. Ramirez's studied opinion that the intrinsic nature of Griffin's chronic twent-year kidney condition, and the related side effects, caused his complications between 2007 and 2010. Simply put, Griffin has not established a genuine issue of material fact concerning medical negligence.

Finally, Griffin cites 18 U.S.C. § 4042, which establishes that the BOP has a duty to keep inmates safe. Although correctional officials are expected to use "ordinary care" under § 4042 to protect prisoners from unreasonable risks, they are not required to provide them with a risk-free environment. *Fleishour v. United States*, 365 F.2d 126, 128-29 (7th Cir.), *cert. denied*, 385 U.S. 987 (1966). The BOP's duty under § 4042 is not absolute; its duty depends on the reasonableness under the circumstances. *Flechsig v. United States*, 786 F. Supp. 646, 649-50 (E.D. Ky. 1991), *affm'd*, 991 F.2d 300 (6th Cir. 1993). Furthermore, § 4042 does not prescribe a course of conduct which a federal employee must follow. The statute allows BOP officials to exercise judgment when making decisions regarding an inmate's safety. *Montez ex rel. Estate of Hearlson v. United States*, 359 F.3d 392, 396-97 (6th Cir. 2004).

Just as Griffin has presented no expert evidence establishing under state law either the standard of care for any of his medical conditions or a corresponding deviation from that standard of care by any BOP medical staff member, he presents nothing to suggest that the BOP medical providers "unreasonably" treated his medical conditions, thus violating § 4042. Because

Griffin has not shown that the judgment of the BOP medical providers at the two prisons fell below § 4042's extremely open-ended standards, his reliance on that statute is unavailing.

Rule 56 requires the entry of summary judgment for the moving party if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); *Kand Medical, Inc. v. Freund Medical Products, Inc*., 963 F.2d 125, 127 (6th Cir. 1992). Further, Rule 56 requires the a plaintiff to present "significant probative" evidence that supports his complaint and demonstrates the existence of a genuine issue of material fact. *Celotex Corporation v. Catrett*, 477 U.S. 317, 324 (1986). This means sufficient evidence from which a jury could reasonably find for him. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986).

To survive a motion for summary judgment in a medical malpractice case in which a medical expert is required, the plaintiff must produce expert evidence or summary judgment is proper. *Andrew v. Begley*, 203 S.W.3d 165 (Ky. App. 2006). Lacking either use of the "common knowledge exception"or admissions from medical service providers to establish negligence, Griffin has not produced "significant probative" evidence of the essential elements of his medical claims, *i.e.*, the applicable standard of care, deviation from that standard of care, and that the deviation proximately caused his conditions or caused any pre-existing conditions to worsen. *See Baptist Healthcare Sys., Inc. v. Miller*, 177 S.W.3d 676 (Ky. 2005).

Based on Dr. Ramirez's undisputed and comprehensive Declaration, and given the absence of proof of medical malpractice under Kentucky law at either prison, the United States is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323. The Court will grant the United States' Motion to Dismiss and will deny as moot Griffin's second motion to amend his

Complaint and his motion seeking appointment of counsel.

V.

Accordingly, **IT IS ORDERED** as follows:

(1) The United States' Motion to Dismiss, or, in the Alternative, Motion for Summary Judgment [R. 28] is **GRANTED**;

(2) Plaintiff Odell Griffin's second motion to amend his Complaint [R. 26] and his motions [R. 34 and 36] seeking reconsideration of an earlier Order denying him the appointment of counsel are **DENIED as MOOT**;

(3) Griffin's Amended Complaint [R. 12] asserting FTCA claims against the United States is **DISMISSED WITH PREJUDICE**;

(4) Judgment shall be entered contemporaneously with this Memorandum Opinion and Order in favor of the United States.

This the 21st day of March, 2011.

Signed By:
*Gregory F. Van Tatenhove*
United States District Judge